120-0688-WC, Raya Ader, Appellant by Britt Eisele v. Illinois Workers' Compensation Commission, United Parcel Service, Appalachia, by Stephen Jacobson. Counsel, for Appellant, you may proceed. Thank you, Your Honor, and good morning, Your Honors and Counsel. My name is Britt Eisele for the Appellant. May it please the Court. Your Honors, we bring this appeal of the Commission's decision for making three points that I'll quickly summarize in just a minute, and depending on the points, we're using either a standard of review of either against the manifest weight of the evidence or an abusive discretion standard. Let me... Mr. Eisele, before you address the points, I got a couple of questions about your brief. Okay. Supreme Court Rule 341H6 requires you to file a statement of facts that contain all the facts necessary for us to make an informed decision in this case and understand the case. You totally left out of your statement of facts any reference to her earlier accident in 1998. You left out of your statement of facts any statement relating to the MRI of her spine taken in October of 2000. You totally left out of your statement of facts Dr. Kornblatt's causation opinion, and you left out of your statement of facts that Raymond Sitko testified and she testified that he's the one she reported it to. Do you understand the Supreme Court Rule to mean you only set forth the facts that are favorable to you? No, no, Your Honor. Of course not. I, and I apologize. I didn't realize I had left these things out. I know they were discussed. Your opponents supplied them for you. So fortunately we had a full statement of facts once we looked at the Eppley's brief, but you know, we can strike briefs for doing this. I mean, it's, it's simply is, is it's not following the rules and these aren't advisory suggestions. They're rules. No, I understand. And I, particularly with the medical records, I know eventually those prior injuries were discussed at length because that's part of the issue in the case is was discussed in the argument, but don't you think we should have part of the statement of facts that she injured her back in 1998, that an MRI was taken in 2000, six years prior to the accident, because it all relates to the issues in this case. You're right. And I think that all is relevant and Your Honor should have had that. So I apologize. I, I don't know why I left that out. Go to the issues you want to talk about. That's fine. Thank you. The three points that I want to make in summary are that first, that there was evidence in the record that in many ways the commission overlooked that allowed for um, the commission, sorry, the commission to, to rule that there was a compensable accident. Instead of the commission substituted its own imagination and suppositions in many ways to make its decision. Second is the issue of the evidentiary presumption. I feel that the commission committed legal error in excusing UPS is failure to produce the subpoena employment records or explain why they couldn't come up with the records, um, which would give Ader the evidentiary presumption. Um, and that failure, uh, should have been to the benefit of Ms. Ader. I'm going to interject an overarching question. Doesn't that argument, doesn't that argument presuppose there ever was a record? Well, it, it, it, it, if there's evidence that there was some kind of records retention and destruction, uh, and their, and, and their custom was to destroy records after a certain amount of time, uh, we don't necessarily need to know if there was a record, if there was enough evidence to show that, uh, they followed a custom of, of records retention. I think, I think maybe It doesn't make any sense that you can have an adverse presumption for failure to produce a record that may never have existed. You got to prove it exists first and they didn't find your client credible. So the only evidence in this record that there ever was such a record is the testimony of your client who was found not to be credible. And Sitko or whatever his last name is, says he doesn't remember her ever reporting an accident that day. So how can you have an adverse inference before you established that the record exists? Well, I would just point out about Sitko that he didn't deny that she filled this out. He just said he couldn't recall. And they found her incredible. They found her incredible. I think they did that though, while overlooking other evidence that I'm going to get to, and also imagining things about her that, that is in line with finding her incredible. And I think that's an abuse of discretion in certain situations. That was going to be the question I was going to ask you counsel, how do we overlook the finding that she was not a credible witness by the arbitrator, which was adopted by the commission? Do we substitute our judgment for the commission and credibility? How do we just ignore that? Well, of course. I think the way we look at it is we look at the record and the things that are missing there. There were certain things missing, such as she testified that she told Fidel. And of course, UPS didn't produce anyone to say whether or not there was Fidel. That wasn't really looked to by the commission, but I think it just hung out there without being properly addressed. Same with this UPS nurse. I mean, UPS has control over its own nurses. It seems to me that if she saw a UPS nurse at her first visit, why should we just forget about that when UPS didn't bring in anyone to rebut that these points of testimony. And then also about her mother. Can I ask you a question? How did they prove a negative? They denied this accident ever even happened. So how did they prove a negative? She says, I saw a UPS nurse. Who was that nurse? Do you know her name? I don't know her name. And I don't know that my client has the burden to keep her business card. Well, can I ask you a question? She said she was taken by CITCO to a facility that night. She couldn't remember the name of the facility, didn't know what city it was in, and didn't produce any records of the treatment. Is that true? That's true. But I would add to that, Your Honor, that the commission went beyond that and said that she's not credible, not believable, because she couldn't remember the address of this clinic. She didn't have a car. I'm sorry? Couldn't even remember the city it was in. She doesn't have a car. She drives by bus to Northbrook from Chicago every day. At night after she's injured, is it so hard to believe that she couldn't remember the route? She's never been to Northbrook, except for work. It seems to me that if you go to a place for medical treatment, you should remember something about it that would identify it. She remembered absolutely nothing. Judge, she's also a 24-year-old, and I can't jump into her shoes. But clearly, the commission did because they found her not credible because she couldn't remember this. Well, counsel, aside from the credibility issue, let's talk about the medical evidence a little bit. Dr. Kornblatt testified that the claimant was symptomatic because she had degenerative disc disease, and that was not caused by the incident in question. There's no question that she had a history of back problems and had sustained a very acute, serious injury to her back some years earlier, correct? Correct. Okay. And Kornblatt testified that it was not work-related, so what was wrong with Kornblatt's opinion? Well, this is the right-way plumbing case that was misapplied by the commission. I mean, there is such a thing, and you all know there's such a thing as an aggravation of a pre-existing condition. We don't have to even consider all these prior injuries or accidents if she re-injured herself. Her last injury was in 2004, two years before this. It wasn't as if she was treating in the weeks prior to this accident. This was something new. So yes, she had this pre-existing condition. It was aggravated by lifting a 50-, 60-pound box. Well, you're correct. There's a well-established body of law that the Kornblatt's testimony purports to foreclose that, saying that this was simply caused by degenerative disc disease. The work incident was not a causal factor at all. Well, and obviously, I disagree because of Dr. Nolden's testimony and Plasteris, and I recognize that the MRI may have had similar findings before and after, but the x-rays had different findings, and I think the x-rays showed that she had an L5-S1 disc that was flared with an x-ray before the accident compared to an x-ray after. These are radiological findings. I know that UPS would like to call them psychological findings or complaints, but they were found in the diagnosis portion of Dr. Plasteris' notes. It would appear to me, unless I'm missing something in this record, that this accident is taking place in October of 2006. The very first medical record in which there is any reference to low back pain that was submitted is a reference to an August 27, 2010, report of Dr. Malik. Don't you think that if she injured her back in 2006, there would at least be some reference in some medical record of a low back injury? I think Your Honor is overlooking the Dr. Plasteris' note from, I think it's November 6 of 2006, which is about one month after the October 2006 accident, and specifically, she's got pain 10 out of 10 in her back, and I know that there's an issue about whether there's a true direct accident history in that note, but she is complaining of low back pain. And then later, the accident histories do pick up in 2010, and I think that provides further corroboration, even though the commission thinks that they're too late to provide corroboration of an accident. I still believe that that's more corroboration that she had an accident in 2006. I would like to mention, because these are the things that didn't make sense to me when I read the commission's decision. The commission made up certain things that I think just had, there was no evidence in the record that they should have been considering. The commission thought it was unbelievable, for example, that Ms. Ader could climb stairs after an accident like this. She did say that she had paralyzing pain, and the arbitrator, and then by adoption, the commission thought it is unbelievable that she would get up and walk up the stairs. She should have just laid down at that point, and that they have no medical basis to give that information. Likewise, they didn't believe her when she didn't know the address of the UPS clinic. I know many of the rest of us would pay attention to it, but it doesn't mean that necessarily, since she doesn't own a car, she takes a bus every day to work. She hasn't taken a tour of Northbrook or wherever it was she went to know the address of the clinic. Is the commission precluded from drawing inferences from the evidence? You said they made up these things. Can't they be characterized as an inference that they drew from the evidence? Of course, an inference, Your Honor, but to just think that she's not credible because she's unable to climb stairs, particularly when there's later information from this ADA accommodation for her shoulder, unrelated, that she could climb. There was evidence that she could do these things and walk, but I just don't know where they come up with this kind of information or attribute that problem to her condition. Can I ask another question? What is the very first medical record that's in front of us that was introduced that states that she told her medical provider that her symptoms started after lifting a heavy load while a UPS employee? What's the very first medical record? Well, we would say that it's, again, Dr. Plasteris' record from November 6th of 2006, but she didn't specifically say. But Plasteris' record merely says bilateral low back pain. Doesn't say how she got it. No, but he mentioned that she's a UPS loader and that there was a 50 to 60 pound box, and we feel that there can be an inference, and there should be an inference that that was, you know, not because of a car accident, but because of a work accident. Um, after that, it picks up in, I believe, 2010, like, as you mentioned. 27th. And there are accident histories after that. Your time is up, Mr. Isley. You'll have time and reply. Thank you, Your Honor. Mr. Jacobson, you may respond. Thank you and good morning. Um, just for the record, I'm Steve Jacobson here on behalf of the defendant's appellee, United Parcel Service. If it may please the court, let me just begin by discussing the overarching picture that is presented to you by the record. The plaintiff, as we've discussed this morning, first injured her back in a gymnastics-related, uh, injury in 1998 or 1999. Um, she was diagnosed with a disc herniation at the L5-S1 disc level, and then 12 or 13 years later, she has spine surgery with Dr. Kornblatt in 2011. Um, and this, uh, 12 or 13 year time span is consistent with a natural progression of an underlying, uh, disc disease process. Uh, and that is supported by our section 12 physician, uh, Dr. Kornblatt. The plaintiff has, uh, filed an application alleging an aggravating injury that occurred in the midpoint of that time span, um, on or about October 2nd of 2006. I use the words on or about because the plaintiff was essentially guessing, um, an accident date when she decided to initiate litigation. Uh, her initial filed application alleged October 1 of 2006, the first day of the month. Then years later, uh, when she's weeks away from trial, she amends her application, uh, because she realizes that October 1 was a Sunday and she never worked on weekends. Um, and so they changed it to Monday, um, October 2nd, and the arbitrator took judicial notice, uh, that the initially alleged accident date fell on a Sunday. Um, and that was one of the, one fact out of a host of facts that was considered and weighed by the commission. Um, the next problem with the plaintiff's case is the medical records are in conflict and contra contradict her trial testimony. Um, this is not a case where the records are silent. It's a case where the records actually contradict her, uh, testimony. Um, the reference to being a UPS loader was not the accident history that was written on the intake form by, uh, miss, uh, Raya Ader in response to a question asking, what is your occupation? In response to the question asking, how did your problem begin? She wrote 1998 or 1999, which we know was her gymnastics injury. There's nothing in the records about any kind of sudden debilitating, excruciating lifting trauma. Um, and her entire case was predicated on a singular lifting trauma, and it's just not in the records. Um, she was sent physical therapy. To be fair, when she went to posterity, is that his name? She also wrote, uh, in response to a question of what asked makes it worse. She wrote walking, bending and lifting things at work. That is correct. Your honor. And, um, uh, the commission was made aware of that. They looked at that. Um, it's my position that, um, experiencing a manifestation of pain while engaged in physical activity is not the equivalent of a compensable work-related accident. Um, you can have pain anytime, anywhere. And I believe the case law supports the notion that the mere an injury that's compensable at work, um, it doesn't arise out of on the course of just because you haven't worked there. I'm sorry, just because you're at work when you feel this pain. Um, could you respond to opposing counsel's argument that this was an aggravation of a preexisting condition? It should be compensable on that theory. Yes. Um, before you, the, the, uh, theory that there was an aggravation presupposes that there was a lifting injury in the first place and our position has always been that this was a failure of proof on the plaintiff's part. She failed to meet her burden of proof because the records don't support it. Um, uh, in addition to that, the x-rays, um, and I disagree with, uh, Mr. Eiseley, but the x-rays and the imaging did not show any acute findings whatsoever. There was no evidence of any structural change. Um, Dr. Plaster ordered a new lumbar spine x-ray. Um, he compared it with a 2004 lumbar x-ray and I not see it, not Dr. Plaster, but the radiologist did the comparison and the radiologist said, uh, there was no, um, significant changes. And he wrote that it was a negative, um, uh, assessment, uh, from a radiological perspective. So there's no evidence of any change, uh, from a radiological perspective. Um, in addition to that, um, she's all done treating by March of 2007. Um, so whatever issue this was, it was short lived because she then, uh, went three years with no back treatment. Um, so we have two significant, uh, gaps in time here. The first being that there's this alleged incident, which we believe never occurred on October 2nd. Then there's a five week delay before she sees, I'm sorry, before she sees Dr. Plaster in November 6th. And then after she completes therapy and stops treatment in March of 07, she doesn't go back to a doctor for her back until May of 2010. And by that point in time, she's working for a new employer and she gives a history of lifting toddlers at the Irving park, um, infant and toddler center. And she says, my back was giving out, uh, I mean, when I was at UPS and my back is giving out at me, um, uh, my new job, but we have this three-year gap with no treatment. Um, and then lastly, she didn't miss any time from work during this alleged, uh, October 06 incident. She continued working full duty, um, during treatment, uh, she continued working full duty after she stopped, uh, treatment. And then she had the shoulder injury, um, when she, um, uh, uh, in two, in December of 2007. And that was the injury that we noted as properly and duly reported. We accepted the shoulder injury as compensable. We paid medical benefits. We paid TTD benefits. And then after she got permanent restrictions, we initiated the ADA interactive process. And when she completed the paperwork, she listed only her shoulders as a condition that needed an accommodation under the Americans with Disabilities Act. She never mentioned anything about a lumbar spine condition or a back injury. Um, so there's no, um, evidence of any aggravation here on that, on that basis. And then we have two, uh, conflicting medical opinion evidence. There's our doctor, Dr. Kornblatt, there's the, uh, plaintiff's medical witness, Dr. Nolden, and it was the role and function of the commission to weigh the credibility of the conflicting medical opinions, um, and to weigh the conflicting accident records, um, and determine which narrative was credible. And it's my position that she failed to sustain her burden of proof. So to me, that answers the question on whether or not there's any evidence of any aggravation. This is a person who has had flare-ups of pain. She first injured herself in 98 or 99. She had a flare-up of pain in 2000, which is when the MRI was ordered. She had another flare-up of pain in 2004 and had an x-ray at that time. And then she had a flare-up of pain in 2006. And Dr. Plasteris' diagnosis of flare or flared was not a radiological finding. That was his diagnosis. The word flared does not appear anywhere in the description of the imaging findings. It appears in the diagnosis of the treating physician. And he's just describing this as another flare-up in a history of episodic back pain flare-ups. If I may continue, um, the other point that the plaintiff raises and places much reliance upon is her mother's testimony. That was Jacqueline Ader, um, because of this alleged phone call. And as I laid out in my brief, there was three strikes against Jacqueline Ader. The first being the most obvious one, that she is the mother. And the love of a mother raises questions of bias and motive. And therefore her testimony was rightfully considered, I'm sorry, subject to scrutiny when it was considered by the commission. The second strike against mom was that she was a stakeholder in the outcome of this case. And I believe it's found at pages 194 and 195 in the record, uh, Jacqueline Ader testified that she paid for her daughter's medical expenses. She paid for prescription medications. She paid for co-payments. She also testified she paid the, what I call the COBRA payments to keep her health insurance, um, ongoing after she abandoned her with UPS. Uh, then Jacqueline Ader testified that she wanted to be reimbursed by the defendant out of this case. So she attest herself to the outcome of this case. She's a financial stakeholder. She is in effect, an unnamed party with a subrogation claim. Um, and so that was another, um, uh, fact that the commission rightfully could consider in this case. And then third and last, the last strike was that she was testifying to a phone conversation that had taken place over a decade before she took the witness stand. Um, and so her ability to remember facts and her ability to remember what this conversation was about, um, was subject to scrutiny. Um, let's take a glass of water first. One second. She, um, never testified to a date or time or gave a surrounding circumstances to this conversation and the year never passed her mouth. The year 2006 was in a leading question by Mr. Isley. Um, now was the mom testifying falsely because of her love for her um, and miss remembering a conversation. I'm sorry, a phone call she may have received in relation to the 2004 work-related shoulder injury or a phone call she may have received regarding the 2007 shoulder injury, or in relation to a phone call she may have received about another accident that no one knows about and which has long since been forgotten. Uh, the commission, it was their role and function to assess Jacqueline Ader's, uh, credibility and they rejected her testimony as not being credible. And there's no reason to overturn this decision on that basis. And then, uh, lastly, there's this idea that a UPS nurse went to the first visit with Dr. Posterous. Well, I would ask where's the foundation testimony for that? How did it come to pass that we weren't even aware of the appointment and who the doctor was and where to go? There's no business card, no name, no description. Also UPS doesn't employ nurses. Insurance companies employ nurses. Third party administrators employ nurses. You, uh, all of you on the bench have been handling workers' comp cases on appeal for many years now. You've seen the records. You're very familiar with nurse case management. Um, it's just incredible that, uh, a UPS nurse would be at this visit. There would have, have to have been a process to get her consent to show up. Um, and there's no paperwork on that. Um, finally there's HIPAA privacy regulations that had to be respected and the doctor would have documented the attendance of a nurse, um, in his treatment records. And there's no documentation of that. And most case went to trial in April of 2017. She made no mention of this purported UPS nurse visit whatsoever. It was only three months later in June when she decides she wants to testify in a rebuttal to Mr. Sitko. Um, and then comes up with this, uh, new story. Uh, the commission was right to, uh, weigh her credibility and they just did not find her credible. Um, all in all, there was conflicting evidence, uh, conflicting evidence between her testimony in the medical records, conflicting medical opinion testimony by the doctors. Um, and it was the commission's role and function to weigh and balance the evidence. And they ruled against her. They found that she failed to prove, um, an accident. Uh, and therefore it's my position. And I ask this court to affirm and uphold the circuit court's decision, uh, confirming the commission's benefits. Thank you. Thank you, Mr. Jacobson. Mr. Isley, you may reply. Thank you, your honor. Um, just picking up where Mr. Jacobson left off. Um, you know, this UPS nurse idea, uh, just kind of makes me, uh, chuckle because why would Ader bring up that she saw a UPS nurse at her appointment, you know, uh, your, your mic is off. Oh, sorry. Can you hear me now? Yes. All right. I, just to say it again, I, I chuckle about this UPS nurse matter because why would miss Ader have even brought this up? Uh, that she saw a UPS nurse at her first appointment in a lawsuit against UPS. Uh, unless she was telling the truth. I mean, UPS has the control over the nurse, not us. I, maybe it's not a nurse hire, you know, a nurse employee from UPS, but they still have the control over their case managers like this nurse. And it seems to me there could have been some kind of a pushback, but there wasn't by UPS. This stands, uh, uncontradicted by, uh, Raya. And I, I, I suppose because she's considered not credible, we're going to forget about it. But likewise, I, I don't see a, uh, an impairment of her mother just because she's a mother. Does that mean that all mothers who testify against their children or with their further children, their testimony is impaired or all children who testify for their mothers, their testimony is impaired. I, and, and just because she couldn't remember the exact date of the, um, of the, uh, of the accident 10 years before it seems, uh, actually pretty, uh, understandable that it's been that long. Um, also UPS wants us to come up with corroboration for the mother, not just her mother's testimony, but corroboration for her testimony, dates, time circumstances when she was speaking, maybe even the telephone bill. I mean, that's not required of the, of a witness, not unless there's some kind of a rebuttal or inconsistent, uh, evidence against her. Uh, so I, I, I think the cases are pretty clear. The commission even has the right to reject uncontradicted testimony if they find the witness not credible. I, yes. And I agree with you. I, um, I feel that, um, that, that there's certain points with her testimony that, that UPS or not UPS, the commission, uh, took up to make her not credible that I, I disagree with, but, but beyond her testimony, um, I I'd like to point out that our amending the application, uh, is a right that the petitioner has to do, uh, right up through the day of trial. And it doesn't indicate some malevolent motive. If we change a date on the application, it could mean that we want to make it consistent with the records. And in fact, that's what we did in this case. Um, so for that to be a factor against Ader, uh, that which should be wrong factor to look at. Um, and also Ader didn't paper her case with records. She didn't spend years and years treating. She went back to work and she went to a doctor to get well. And when she felt well, she stopped seeing a doctor. Uh, she picked it up in 2010 when she started feeling bad again, and evidently it was bad enough that she needed surgery to her back. So I, again, I, I to give her some kind of, uh, motive that she wasn't treating because she wasn't injured. Um, I think is wrong. Um, likewise her continuing to work full duty. I think it was, uh, something she was doing in good faith because she, she wanted to work. Um, your honors, I, I would ask that the circuit court order be, uh, confirm the decision be reversed, uh, that the commission's decision, uh, also be reversed on the issues of accident and causation and that it be remanded to the commission for an award of TTD medical and permanency. And also that this, uh, uh, court, uh, recognize our unconstitutional claims that, uh, if she is awarded permanency benefits, uh, she'd be treated like in proportion, uh, like a full-time UPS loader who has the same injury. Thank you. Okay. Thank you. Council matter this morning.